## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ARTHUR H.,

    **Plaintiff,**

      **v.**

**ANDREW SAUL,** *Commissioner,*
*Social Security Administration,*

    **Defendant.**

**CIVIL ACTION FILE**

**No. 1:19-cv-02517-AJB**

## ORDER AND OPINION[1]

Plaintiff Arthur H. brought this action pursuant to §§ 205(g) and 1631(c) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for social security disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act.[2]   For the reasons set forth below, the Court

---

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entry dated Sept. 20, 2019).  Therefore, this Order constitutes a final Order of the Court.

[2]    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*,

**REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on November 29, 2010, alleging disability commencing on December 27, 2007.   [Record (hereinafter "R") 452-61].   Plaintiff's application was denied initially and on reconsideration. [R182-85].   Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").   [R258-59].   An evidentiary hearing was held on November 2, 2012.   [R129-81].   The ALJ issued a decision on February 8, 2013, denying

---

provides for supplemental security income for the disabled.   Title II of the Social Security Act provides for federal disability insurance benefits.   42 U.S.C. § 401, *et seq.*   Title XVI claims are not tied to the attainment of a particular period of insurance eligibility.   *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).   The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).   Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income [hereinafter SSI].   In general, the legal standards to be applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB), to establish a "Period of Disability," or to recover Supplemental Security Income (SSI). However, different statutes and regulations apply to each type of claim.   Many times, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this Order should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision.  [R186-204].  Plaintiff sought review by the Appeals Council, and the Appeals Council sent the case back to the ALJ. [R205-09].

A second evidentiary hearing was held on November 20, 2015.  [R79-128]. The ALJ issued a decision on March 1, 2016, denying Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision.  [R210-32].  Plaintiff again sought review by the Appeals Council, and the Appeals Council sent the case back to the ALJ.  [R233-37].  A third evidentiary hearing was held on August 21, 2018.  [R32-73].  The ALJ issued a decision on November 16, 2018, denying Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision.  [R7-31].  Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on April 4, 2019, making the ALJ's decision the final decision of the Commissioner.  [R1-6].

Plaintiff then filed an action in this Court on May 31, 2019, seeking review of the Commissioner's decision.  [Doc. 1].  The answer and transcript were filed on November 4, 2019.  [Docs. 6-7].  On February 18, 2020, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 12],

3

on March 19, 2020, the Commissioner filed a response in support of the decision, [Doc. 13], and on April 2, 2020, Plaintiff filed a reply brief, [Doc. 16].   The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[3]

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the general issue to be decided is whether the Commissioner's decision was supported by substantial evidence and the specific issues are (1) whether the ALJ failed to evaluate medical and vocational opinions, probative objective evidence, and to include limitations imposed by psychologists that she did not reject, in finding that Plaintiff could perform simple work without physical limitations, and (2) whether the ALJ failed to evaluate all the relevant evidence and relied on unsupported reasons to discount Plaintiff's limitations.  [Doc. 12 at 7].

## III.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if

---

[3]      Neither party requested oral argument, (*see* Dkt.), and the Court concludes that it may rely on the record and the parties' filings alone in reviewing the Commissioner's decision.

he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p,

2000 WL 1898704 (Dec. 4, 2000),[4] *on other grounds as stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).   The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled

_____

[4]      Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.   *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d   330,   338-39   (S.D.N.Y.   2001);   *Tauber   v.   Barnhart*, 438 F. Supp. 2d   1366,   1377 n.6   (N.D.   Ga.   2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).   Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.   *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

without consideration of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209

7

(11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## IV.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## V.   **STATEMENT OF FACTS**[5]

### A.   **Background**

Plaintiff was an older individual on the alleged onset date, with at least a high school education, and past relevant work as a heavy delivery truck driver, warehouse worker, and material handler.  [R45, 452, 545].  Plaintiff alleges disability due to mood disorder, not otherwise specified, depressive disorder, not otherwise specified, borderline intellectual functioning, a cervical impairment, depression, stress, anxiety, insomnia, forgetfulness, a somatoform disorder, and Bell's Palsy.  [R14, 39-40; Doc. 13 at 7-9].

### B.   **Administrative Hearing before the ALJ**

At the hearing, the ALJ noted that Plaintiff was running a bit late to the proceeding.  [R34].  In the meantime, Plaintiff's counsel summarized the expected evidence: that Plaintiff was tested as having an IQ of 70, was illiterate, and tested at the third or fourth grade level in reading and math, [R39]; developed a degenerative disc disease following an accident where a pipe fell on his back,

---

[5]       In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 12-13, 16; *see also* Doc. 8 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")].  Where a party's numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

[*id.*]; had degenerative joint disease of his right knee and was prescribed a cane, [*id.*]; suffered from depression, had trouble with stress because of limited coping skills, had low energy, lack of motivation, anxiety based on excessive worry, insomnia, forgetfulness, a somatoform disorder; and had Bell's Palsy.  [R39-40]. Plaintiff had worked at Express Services, doing lifting and packing, and also worked at Westaff USA, Common Steel, and Walmart.  [R41-42].  His last job was in 2009 when he worked for one month as a stacker before being fired. [R42].   Plaintiff had an injury in 2006 for which he received workers compensation.  [R43-44].

Plaintiff completed twelfth grade, was in special education, and was married without children under 18 years old. [R45-46].  Plaintiff drank alcohol occasionally but had not been hospitalized or in a treatment program for drugs or alcohol. [R48].  Plaintiff's attorney argued that Plaintiff's Bell's Palsy was a severe impairment and that he had ongoing issues with his speech and that his facial muscles did not move as they should.  [R48-49].  Counsel pointed out that the medical record indicated he had a moderate ability to get along with others without distracting them or exhibiting behavioral extremes and that even moderate limitations in this area could be an issue.  [R52].

Plaintiff then arrived at the hearing after being delayed in traffic.  [R52-53]. Plaintiff testified that he was 55 years old, married, and had two adult children. [R53-54].  His medication made him sleepy.  [R54].  He was in special education classes all throughout school.  [R55].  His wife worked as a licensed practical nurse.  [R56].  Plaintiff worked at Express Service taking fiberglass off a belt until 2009 and after that he did some "little temp jobs."  [R56-57].  He worked for one month in 2009 stacking boxes at Carters.  [*Id.*].  A pipe fell onto his lower back and head in 2006.  [R58].  He currently took blood pressure and cholesterol medication as well as ibuprofen for pain.  [R58-59].  He had not been hospitalized in the last twelve months.  [R59].

Plaintiff stated that he had three canes following knee surgery in 2007 or 2008, but that he had broken the one he brought to the hearing.  [R59-60].   He related that a truck fell on him four years prior to the hearing.  [R60-61].

Plaintiff testified that he could only walk about one-eighth of a mile, could only stand for 15 minutes, could lift and carry 5 or 10 pounds comfortably, could climb about four or five flights of stairs, could not bend, stoop, or squat because of his back, and drank one beer two times a week.  [R62-64].  Plaintiff testified that he could not work full time because his medications did not really affect him and he had problems focusing due to his Bell's Palsy.  [R65].  He explained that

12

he could not move the right side of his face.  [*Id.*].

Plaintiff also testified that he elevated his legs every day for five hours since 2008.  [R66-67].

The Vocational Expert ("VE") identified Plaintiff's work history as including heavy delivery truck driver (typically performed at a medium level of exertion), warehouse worker (medium exertion), material handler (heavy exertion), hand packer (medium exertion), and stacker (heavy exertion).  [R45]. The VE testified that a person of Plaintiff's age, education, and work experience with no exertional limitations, but was limited to performing simple, routine tasks involving no more than simple, short instructions, simple work-related decisions, few work place changes, and only occasional interaction with others, could perform Plaintiff's prior work as a packer and a warehouse worker.  [R68].  The VE testified that such an individual also could work as a baler, night cleaner, and jackhammer operator.  [R68-69].

The VE also testified that, even at the medium exertional level, the hypothetical individual could perform the packer and warehouse worker positions and also could be employed as a dishwasher, kitchen helper, and motor vehicle assembler.  [R69].  Moreover, she testified, if the person could only perform at the light exertional level, with a sit/stand option at-will that allowed alternate

13

sitting and standing positions without leaving the work station, Plaintiff's past work could not be performed, but the individual could be employed as a routing clerk, silver wrapper, and shellfish preparer. [R69-70]. The VE next testified that no jobs would exist at the sedentary exertional level, where the individual could not maintain necessary concentration, persistence, or pace to perform work activity full time and would miss three or more days per month due to medical impairments or treatments. [R70-71]. The VE further testified that only approximately fifteen percent off-task time was acceptable. [R71]. In addition, a person who needed to lay down five to six hours a day, or even one to two hours a day, would not be able to find competitive work, [R71-72], nor would a person with moderate limitations in interacting with others without exhibiting behavior extremes or distracting them. [R72]. Finally, the VE opined that illiteracy would prevent a claimant from doing work requiring reading or writing. [*Id.*].

## C.   Medical Records

On December 22, 2010, Plaintiff completed a work history report indicating that he worked at Common Steel from 1998 to 2006, at Hogge Septic Tank from 1995 to 1996, at West Georgia Medical Center from 1981 to 1992, and at Elm City from 1980 to 1981. [R550]. Plaintiff stated that while working at Common Steel he primarily handled steel and material and worked as a forklift

and truck driver.  [R551.].   Plaintiff further stated that he lifted steel most of the day and worked most of the day.  [*Id.*].

On January 27, 2011 Plaintiff filled out a function report indicating that he ate breakfast, bathed, dressed, and went for walks on his own.  [R562].  Plaintiff stated that he did not need reminders to take care of personal needs or take medicine, went out on his own, drove, went to shops, and could count change but could not pay his bills or handle a savings account.  [R564-65].  Plaintiff stated that he could not prepare meals because his back hurt.  [R564].  He indicated that he watched television occasionally.  [R566].  He also stated that he did not get along well with authority figures, did not handle changes in his routine well, used crutches and canes, and feared living.  [R570].

On May 3, 2011, Plaintiff was seen for a psychiatric diagnostic interview examination by Winston R. Pineda, M.D.[6]  [R896].  Dr. Pineda noted that Plaintiff stated that he suffered from clinical depression all of his life and that his past health problems included knee and back pain.  [*Id.*].

On July 12, 2011, Dick Maierhofer, Ph.D., completed a psychological report regarding Plaintiff.   [R846].   Dr. Maierhofer noted that Plaintiff's

---

[6]      The Court notes that Dr. Pineda's handwriting is difficult to read in parts.

grooming and hygiene appeared limited and that he attended special education classes in high school. [R846]. Plaintiff reported that he slept adequately with his medicine, his appetite was good, and his hearing and vision were both adequate. [R847]. Plaintiff stated that his health was "all messed up." [*Id.*]. He stated that he could microwave food, wash dishes, sweep, make his bed, and empty the garbage, but did not do yard work. [*Id.*]. Plaintiff further told Dr. Maierhofer that, although he went to Walmart, he did not go grocery shopping or to church and his reading skills were limited. [*Id.*].

Dr. Maierhofer found that Plaintiff exhibited anxiety and depression but denied suicidal or homicidal ideation. [R848]. Plaintiff was found to be moody and restless and to have anger management problems, but no confusion was found in his thinking, his stream of thought was adequate, and his thought content as generally relevant. [*Id.*]. Dr. Maierhofer found that Plaintiff's intellectual skills were fair, his orientation abilities appeared to be appropriate, his concentration was weak, his memory was fair, he could not spell "world" forwards or backwards but he was able to do serial 7s. [*Id.*]. Dr. Maierhofer found that Plaintiff's scores placed in him the upper end of the mildly retarded intellectual area. [R848-49]. Dr. Maierhofer diagnosed Plaintiff with depressive disorder, mood disorder, substance abuse, borderline intellectual functioning, and being

16

overweight with heart trouble.  [R849].  He noted that Plaintiff had indicated a desire for work, looked for jobs, and felt he would be much better emotionally if he had a job.   [*Id.*].  Dr. Maierhofer found that Plaintiff could carry out simple jobs from a cognitive standpoint but his reading skills were limited and he would have some trouble dealing with other others.  [*Id.*].  Dr. Maierhofer suspected that if Plaintiff did have a job, his problems with others would diminish.  [*Id.*]. Finally, Dr. Maierhofer found that Plaintiff's pace on a job would be fair, he would be able to adhere to a work schedule, but he would have trouble dealing with stress.  [*Id.*].

On August 1, 2011, Ndiya Nkongho, Ph.D., completed a mental residual functional capacity assessment of Plaintiff.  [R866].  Dr. Nkongho found that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, his ability to maintain attention and concentration or extended periods, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted, to complete a normal work-week without interruptions from psychologically based symptoms, to interact appropriately with the general public and get along with coworkers without distracting them, to respond appropriately to changes in work setting, and to set realistic goals and make plans independently.  [R866-67].

17

Dr. Nkongho concluded that Plaintiff had no marked limitations and that he had the ability to remember simple- to moderately-detailed instructions and to remember work location settings. [R868].  Dr. Nkongho found that Plaintiff's concentration and persistence were generally adequate for routine task completion but that he was limited in his ability to work in close proximity to others because of his emotional lability.  [*Id.*].  She found that Plaintiff might fare well in employment that minimized regular contact with large groups, did not require work with the public, and that he would "fare well in a low-stress working environment" with a "non-confrontational supervisor."  [*Id.*].  Dr. Nkongho found further that Plaintiff would farewell in a well-structured environment with routine tasks that did not require independent planning.  [*Id.*].

On August 19, 2011, Plaintiff was seen by at Pathways Center Nursing for an Assessment Update.  [R903].  The assessment indicated that Plaintiff suffered from anxiety, social isolation, sadness, insomnia, irritability, and hypertension. [*Id.*].  The notes further reflected that Plaintiff had a good appetite, slept well, had some thoughts of suicidal and homicidal ideation, his medications kept him relaxed, he isolated himself, and that he was family oriented.  [R904].

On November 8, 2011, Plaintiff saw Vishwas Kadam, M.D., and was diagnosed with chronic knee pain, chronic lower back pain, depression, a history

18

of heart attack, marijuana abuse, and being a tobacco user.  [R879].  Dr. Kadam noted that he was well-developed and groomed, had lower back pain, and ordered Plaintiff to return in three months.  [R881-82].

On February 13, 2012, Plaintiff was seen by Dr. Kadam for a follow-up visit.  [R1176].  Dr. Kadam listed chronic conditions including depression and lower back pain.  [*Id.*].  Plaintiff reported feeling well with minor complaints and stated that he had been compliant with instructions and medications.  [*Id.*]. Plaintiff was found to have a full range of movement with his head and neck and normal strength and coordination.  [R1176-77].

On March 6, 2012, Winston Pineda, M.D., completed a residual functional capacity in psychiatric impairment indicating that Plaintiff suffered from an affective disorder, anxiety, and somatoform.  [R886].  Dr. Pineda found that the disability would last more than 12 months and that Plaintiff had poor or no ability to follow work rules, relate to coworkers, deal with the public, interact with supervisors, deal with work stress, function independently, or maintain attention or concentration. [*Id.*].  Dr. Pineda found that Plaintiff had a fair ability to use judgment.  [*Id.*].  Dr. Pineda further found that Plaintiff had poor to no ability to understand, remember and carry our detailed or complex job instructions, but had a fair ability to understand, remember, and carry out simple job instructions.

19

[R887].  Dr. Pineda further found that Plaintiff had poor or no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability, but had a fair ability to maintain his personal appearance. [*Id.*].

On March 27, 2012, Sherri Kirby, a Certified Rehabilitation Counselor, wrote a letter indicating that she had met Plaintiff to assess his suitability for Vocational Rehabilitation Services and found that he would not benefit from such services.  [R623].  Kirby found that Plaintiff had numerous functional limitations that would prevent him from working and recommended he pursue an application for disability benefits.  [*Id.*].

On April 16, 2012, Dr. Kadam filled out a physical capacities form for Plaintiff.[7]  [R889].  The form indicated weakness and sensory loss, continuous and severe pain, and asserted that Plaintiff could not tolerate a competitive work setting.  [*Id.*].  It also provided that Plaintiff could only stand or sit for 15 minutes in a competitive work environment, and required 1-2 hours rest for each 5-6 hours worked.  [*Id.*].  Dr. Kadam further concluded that Plaintiff could occasionally lift and carry up to 26 to 50 pounds, occasionally bend, square, climb, and reach

---

[7]    The form also was signed by Plaintiff's physical therapist, William Kuerei, on March 28, 2012.  [R889].

overhead, but could do little or no crawling or pulling.  [*Id.*].  The form further indicated that Plaintiff must totally avoid unprotected heights, being around moving machinery, and riving, but had no limitations as to humidity or temperature or exposure to dust.  [*Id.*].  The form stated that Plaintiff's disability began in 1982 and would last for more than 12 months.  [*Id.*].

On May 14, 2012, Plaintiff saw Dr. Kadam with reports of hand and knee pain.  [R918].  Plaintiff's past medical history included chronic back pain.  [*Id.*].  Plaintiff reported feeling well, without fatigue, headaches, shortness of breath, dizziness, or anxiety.  [R919].  However, Dr. Kadam noted a decreased range of motion, joint pain, and joint swelling.  [*Id.*].  An examination of Plaintiff's lower back pain revealed a degree of left neural foraminal stenosis at C5-C6, C6-C-7.  [R924].  Dr. Kadam concluded that there were degenerative changes of the cervical spine but no abnormal movement during flexion or extension.  [*Id.*].

On July 17, 2012, Plaintiff saw Dr. Kadam complaining of pain increasing gradually over the course of four months precipitated by heavy lifting.  [R926].  Dr. Kadam noted that Plaintiff was feeling well, had no headache or shortness of breath, no dizziness or numbness, and no anxiety.  [R927].  Dr. Kadam further noted that Plaintiff was alert, well groomed, not in acute distress, had a full range of motion in his head and neck, and had normal muscle strength.  [R928-29].

21

Plaintiff saw Jameson Estes, M.D., on October 8, 2012 complaining of facial weakness but denying chest or abdominal pain. [R973-74]. Dr. Estes's clinical impression was of Bell's Palsy. [R975]. Plaintiff was seen the next day by Dr. Kadam and complained of having numbness on the right side of his face and pain in his neck. [R1167]. In the review of symptoms, Plaintiff stated that he was present and feeling well but was noted to have muscular weakens and numbness. [*Id.*].

On December 10, 2012, Plaintiff saw Dr. Kadam complaining of knee and back pain. Dr. Kadam noted chronic conditions including hypertension and Bell's Palsy. [R1164]. Plaintiff described dull and constant pain in his back with no radiation. [*Id.*]. Plaintiff described feeling well, having no respiratory or cardiovascular pain, no dizziness, numbness, or weakness, being alert and cooperative, being oriented as to time, place, purpose, and person, but as having lower back pain. [R1165]. Plaintiff's head and neck were noted to have a full range of motion and he was found to have normal muscle strength and coordination. [*Id.*].

On February 28, 2013, Plaintiff was seen for back strain at West Georgia Family Practice. [R1040]. No procedures or lab tests were ordered and Plaintiff was instructed to visit Dr. Kadam in two weeks. [*Id.*].

22

On March 12, 2013, Plaintiff was seen by Sana Maneer, M.D., presenting with hypertension and complaining of back pain.  [R939].  A review of systems indicated that Plaintiff was feeling well and had no neurologic or psychiatric issues but did have back pain and back ache.  [R939-40].  Dr. Maneer noted that Plaintiff was alert and cooperative and was oriented to time, person, and place. [R940].

On April 10, 2013, Plaintiff was seen by Dr. Maneer to discuss lab results and complaining of hypertension and back pain.  [R935].  Plaintiff stated that he had dull and aching pain in his mid and lower back but no radiation.  [*Id.*].  A review of systems indicated that Plaintiff was feeling well and had no neurologic or psychiatric issues but did have back pain.  [R936].  Dr. Maneer noted that Plaintiff was alert and cooperative and was oriented to time, person, and place. [*Id.*].

On May 23, 2013, Plaintiff was seen by Dr. Maneer presenting with back pain.  [R932].  Dr. Maneer noted that Plaintiff had an epidural injection in the past and Tramadol[8] was among the medications listed for Plaintiff.  [*Id.*]. A

---

[8]    Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain in adults.  Drugs.com, *Tramadol*, https://www.drugs.com/tramadol.html (last visited 09/19/2020).

review of systems indicated that Plaintiff was feeling well and had no neurologic or psychiatric issues.  [R933].  Dr. Maneer noted that Plaintiff was alert and cooperative and was oriented to time, person, and place.  [R933-34].

On September 7, 2013, Plaintiff received a CT Cervical spine non contrast exam.  [R963].  The notes indicate a clinical history of neck pain.  [*Id.*].  The exam indicated no compression deformities, or fracture lucencies, but did find moderate age-related changes in the mid cervical spine and osteophytosis.  [*Id.*]. The impression was of degenerative changes without acute abnormality.  [*Id.*].

On May 14, 2014, Plaintiff saw Dr. Kadam for a follow-up visit and reported feeling well with minor complaints and stated he had been compliant with instructions and his medications.  [R1172].  Plaintiff complained of head and knee pain.  [*Id.*].  A review of systems indicated that Plaintiff was feeling well, had a full range of motion with his head and neck, and hard normal strength and coordination.  [R1173-74].

On June 12, 2014, Plaintiff was seen by Benise L. Williams, M.D., and complained of numerous medical issues, including chronic neck and back pain. [R1019].  Dr. Williams referred him to orthopedics and to pain management. [*Id.*].  A review of symptoms found constitutional fatigue.  [*Id.*].  Plaintiff was found to be alert and oriented, in no acute distress, to walk with a cane, and to be

24

cooperative with an appropriate mood and affect.  [R1020-21].  Dr. Williams ordered Plaintiff to comply with his medications and to keep all his scheduled appointments.  [*Id.*].

On July 8, 2014, Plaintiff was seen by Dr. Williams complaining of hematochezia,[9] neck pain, and malaise.  [R1014].  Plaintiff stated that he had blood in his stool and was scheduled for an MRI of his neck and a colonoscopy. [*Id.*].  A review of systems found constitutional fatigue but no musculoskeletal, neurologic, or psychiatric issues.  [*Id.*].

On February 23, 2015, Plaintiff was seen by Dr. Kadam to establish care and complained of high cholesterol, hypertension, anxiety, back pain, and neck pain.  [R1159].  Plaintiff stated that he had cervical pain for years, it was stabbing and burning, and radiated out to his neck, arms, and shoulders.  [*Id.*].  A review of systems indicated abnormal blood pressure.  [R1160].  Dr. Kadam noted that plaintiff was alert, cooperative, not in acute distress, and oriented as to time, place, purpose, and person.  [*Id.*].

─────────────────────

[9]     Hematochezia is the passage of fresh blood per anus, usually in or with stools.  Wilson ID. *Hematemesis, Melena, and Hematochezia*. In: Walker HK, Hall WD, Hurst JW, editors. Clinical Methods: The History, Physical, and Laboratory Examinations. 3rd edition. Boston: Butterworths; 1990. Chapter 85. Available from: https://www.ncbi.nlm.nih.gov/books/NBK411/ (last visited 09/19/2020)

On February 27, 2015, Plaintiff was seen at Emory Southern Orthopedics by Robert Comerford, M.D., for neck and back pain that he said had been occurring for years.   [R1062].   Plaintiff also complained of numbness intermittently in both extremities and Dr. Comerford noted a previous x-ray and CAT scan that showed significant degeneration.  [*Id.*].   Dr. Comerford noted that Plaintiff ambulated normally, had a full range of motion of the cervical spine without pain, normal strength in his upper extremities, Plaintiff's back had no abnormalities, and the contours of his back were normal.   [R1064]. Dr. Comerford's conclusion was that most of his pain was axial.   [*Id.*]. Dr. Comerford ordered an MRI and ordered Plaintiff to start physical therapy. [*Id.*].

On March 5, 2015, Plaintiff saw Dr. Comerford at Emory Healthcare for an MRI Cervical Spine without Contrast.  [R1065].  Dr. Comerford noted bilateral arm and neck pain.  [*Id.*].  He found that the spinal cord was normal in size, shape, and signal intensity but noted that C5-C6 had mild right and severe left neural foraminal narrowing and borderline central spinal stenosis.  [*Id.*].  He made the same findings with regard to C6-C7.  [R1066].  His impressions were of mild to moderate degenerative change between C5-C7, severe left neural foraminal

narrowing at C5-C6, and mild to moderate bilateral neural foraminal narrowing from C6-C7.  [*Id.*].

On March 15, 2015, Plaintiff was seen by Dr. Comerford for a follow-up of his neck pain after receiving an MRI.  [R1059].  Plaintiff did not complain of clear radicular symptoms but did mention some dysesthesia in both hands.  [*Id.*]. Plaintiff had only gone to physical therapy once.  [*Id.*].  A review of symptoms revealed no constitutional, cardiovascular, neurologic, or psychiatric issues.  [*Id.*]. Dr. Comerford planned for Plaintiff to continue physical therapy, ordered him to return in four weeks, and refilled his Tramadol.  [R1061].

On April 8, 2015, Plaintiff was seen by Dr. Comerford for a follow-up visit regarding his neck pain.  [R1056].  Plaintiff stated that he had been going to physical therapy but was not doing any better.  [*Id.*].

On June 26, 2015, Plaintiff saw Dr. Kadam for a follow-up visit.  [R1153]. Plaintiff reported feeling well with minor complaints and said he had been compliant with instructions and medication.  [*Id.*].  A review of systems indicated that Plaintiff was feeling well.  [R1154].  His head and neck were found to have a full range of motion, his muscle strength was normal, and his coordination was normal.  [R1154-55].

On July 14, 2015, Plaintiff was seen for a psychological evaluation by

Lenore Doster, M.A., Psy.D.  [R1023].  Doster found that Plaintiff's cleanliness and hygiene were good and he walked slowly.  [*Id.*].  Plaintiff further stated that he took special education classes in all subjects while in school.  [R1024]. Plaintiff denied homicidal ideation but admitted to fleeting suicidal ideation without a plan.  [R1025].  Plaintiff described his mood as angry, irritable, withdrawn, and stated that he cried twice a week. [*Id.*].  Doster found that Plaintiff was oriented as to person, place, and time, his eye contact was fair, and his thought process was seemingly clear and logical but with rumination.  [*Id.*]. Plaintiff was able to spell "world" forward but not backward and appeared able to follow spoken and written instructions.  [*Id.*].  Doster found that Plaintiff fell in the low range of intellectual functioning but that he was cooperative throughout the interview and showed no signs of malingering.  [R1026].

Plaintiff informed Doster that he managed his medications and finances without difficulty, could prepare elaborate meals, could wash dishes, vacuum, sweep, and do laundry, and enjoyed watching football on television.  [*Id.*].  In summary, Doster found moderate impairment in Plaintiff's ability to relate socially and to be effective with the generally public. [R1027]. Doster concluded that Plaintiff could follow ordinary written and spoken instructions but appeared to have a history of angry outbursts and frustration.  [*Id.*].  Doster found that if

28

Plaintiff was to return to work it would be best if he had a calm and encouraging supervisor.  [*Id.*].

On October 26, 2015, Plaintiff saw Dr. Kadam for hypertension, hyperlipidemia, anxiety, and arthritis.  [R1150].  Plaintiff reported feeling well.  [R1151].  Plaintiff reported no dizziness, numbness, or weakness, appeared alert and cooperative, and was oriented as to time, place, purpose, and person.  [*Id.*].  Plaintiff's head and neck were found to have a full range of motion, his strength was 5/5, and his coordination was normal.  [R1151-52].

On January 25, 2017, Plaintiff was seen by Olanrewaju Ladipo, M.D., for an annual exam.  [R1198].  Dr. Ladipo noted Plaintiff was alert and oriented, not in apparent distress, had normal heart sounds, had a full range of motion, was oriented as to time and space, and that his memory, attention, and concentration were all intact.  [R1199].  Plaintiff's head and neck were also found to have a full range of movement.  [*Id.*].

On February 1, 2017, Plaintiff was seen by Dr. Ladipo for a lab review and complaining of back pain.  [R1201].  Dr. Ladipo had an MRI taken of Plaintiff and also requested that Plaintiff bring prior x-rays, which Plaintiff had forgotten.  [*Id.*].  Dr. Ladipo noted Plaintiff was alert and oriented, not in apparent distress, had normal heart sounds, had a full range of motion, was oriented as to time and

space, and that his memory, attention, and concentration were all intact. [R1202].

Plaintiff was seen on March 1, 2017 by Dr. Ladipo for a follow-up and stated he had intermittent neck pain and had high cholesterol. [R1204]. Dr. Ladipo noted that Plaintiff was alert and oriented, in no apparent distress, had normal heart sounds, had a full range of motion, symmetric strength, and normal muscle tone, had good coordination, his memory, attention, and concentration were grossly intact, and his speech was fluent. [R1205].

On June 19, 2017, Plaintiff was seen by Dr. Ladipo to receive lab results and complaining of acid reflux and pain and weakness in his neck. [R1210]. Dr. Ladipo noted Plaintiff was alert and oriented, not in apparent distress, had normal heart sounds, had a full range of motion, was oriented as to time and space, and that his memory, attention, and concentration were all intact. [R1211].

## VI.    **ALJ'S FINDINGS**

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since December 31, 2007, the alleged onset date . . . .

    . . .

3.    The claimant has the following severe impairments: mood disorder, not otherwise specific; depressive disorder, not otherwise specified;

30

and borderline intellectual functioning . . . .

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 . . . .

. . .

5.    After careful consideration of the entire record, [the ALJ found] that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but has nonexertional limitations.   This person would be limited to performing simple routine tasks involving no more than simple short instructions and simple work-related decision with few workplace changes and only occasional interaction with coworkers and the general public.

. . .

6.    The claimant is capable of performing past relevant work as a Warehouse Worker . . . and Hand Packager . . . .   This work does not require the performance of work-related activities precluded by the claimant's functional capacity . . . .

. . .

7.    The claimant was not under a disability, as defined in the Social Security Act, from December 31, 2017, through the date of this decision . . . .

[R10-21].

The ALJ explained that the Appeals Council's remand order directed her to do numerous things, including "evaluate the treating and non-treating source opinions . . . and explain the weight given to such opinion evidence." [R11].   The

31

ALJ found that, after careful consideration of the evidence, Plaintiff was not under a disability from December 31, 2007 through the date of the decision. [R12].  The ALJ first concluded that Plaintiff's polysubstance abuse and Bell's Palsy were determinable impairments but were non-severe because there was no medical evidence establishing they would have more than a minimal effect on his ability to work.  [R14].  With regard to his Bell's Palsy, the ALJ found that the medical record noted some jaw locking on the right side but musculoskeletal and neurological examinations were otherwise unremarkable and treatment was routine and conservative.  [*Id.*].

The ALJ also concluded that Plaintiff's mental impairments, considered singly or in combination, did not meet or medically equal the required criteria. [R15].  The ALJ found that Plaintiff had a mild limitation in understanding, remember, or applying information and was able to tend to personal care needs and grooming, take medication, drive a car, shop, count change, use a microwave, and play cards and games.  [*Id.*].  With regard to interacting with others, the ALJ found Plaintiff had a moderate limitation because the evidence indicated that he was able to go outside daily, go out alone, shop in stores, attend church, and go to the homes of family members.  [*Id.*].  The ALJ further found that Plaintiff had a moderate limitation in concentrating, persisting, or maintaining pace, because the

32

record showed some difficulty with written and spoken instructions but also that he maintained an adequate ability in this domain and could also drive, shop in stores, use a microwave, and play cards and games. [*Id.*]. As for adapting or managing himself, the ALJ found that Plaintiff had no limitation because he was able to be independent in personal care and hygiene and was able to drive, shop, prepare his own food, and complete other chores. [*Id.*]. The ALJ therefore concluded that Plaintiff did not satisfy the "paragraph B" criteria and also found that the "paragraph C" was not satisfied because the evidence failed to establish the presence of neurocognitive or depressive, bipolar and related disorders. [R15-16].

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform a full range of work at all exertional levels but with non-exertional limitations. [R16]. The ALJ found that he was limited to performing simple routine tasks involving no more than simple short instructions and simple work-related decisions, with few workplace changes, and only occasional interaction with coworkers to and the general public. [*Id.*]. in so formulating Plaintiff's RFC, the ALJ stated that she had considered all Plaintiff's symptoms to the extent they could reasonably be accepted as consistent with the evidence and also considered the opinion evidence. [*Id.*]. The ALJ concluded that Plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the evidence.  [R17].

The ALJ gave partial weight to the June 2011 opinion of Dr. Erchak, who opined that Plaintiff could be depressed and his pain could be a physical manifestation of his depression, because Dr. Erchak was not a mental health specialist.   [R17-18].   The ALJ gave partial weight to the opinion of Dr. Maierhofer, who found that Plaintiff could carry out basic jobs from a cognitive standpoint, he would have some trouble dealing with others but those problems would diminish, his concentration skills were weak but he would be able to adhere to a work schedule.  [R18].  The ALJ did not agree that Plaintiff would be limited in employment due to depression and fluctuating moods because other evidence showed that he was able to function; for example, he was able to drive, prepare food, use a microwave, and play card games. [*Id.*].  The ALJ stated that she agreed with the other limitations imposed and found that, per the vocational expert, Plaintiff would be able to perform some past relevant work even with those limitations.  [*Id.*].

The ALJ gave great weight to the August 2011 opinion of Dr. Nkongho, who opined that Plaintiff had no marked limitations, his concentration and task

persistence were adequate, and any interruption to his schedule would be intermittent and temporary. [*Id.*]. The ALJ noted that, although Dr. Nkongho found some weak concentration, it was found to be adequate, which was consistent with Plaintiff's ability to attend doctor visits and articulate his concerns. [*Id.*].

The ALJ gave lesser weight to the March 2012 opinion of Dr. Pineda, finding that it was not supported by the medical evidence of record. [*Id.*]. Although Dr. Pineda found that Plaintiff had poor coping and cognitive skills, impaired concentration and forgetfulness, and poor self-esteem and socialization, the ALJ pointed to medical records between April 2011 and June 2012 without significant findings. [*Id.*]. The ALJ also noted that there was no noted issue with suicidal or homicidal ideation, hallucinations, or delusions. [R18-19]. The ALJ further observed that, although medical evidence from primary care doctors from 2012 to 2016 noted occasional anxiety and depression, they primarily documented cooperativeness and a lack of acute distress. [R19].

The ALJ noted that between 2013 and 2018, there appeared to be only one mental health assessment, in 2016 from Dr. Doster. [*Id.*]. The ALJ gave Dr. Doster's opinion great weight in that it did not suggest a disabling condition, it was supported by previous medical evidence, the limitations were accounted for

in the RFC, and it was consistent with the daily activities and Dr. Doster's own observations and assessments. [*Id.*]. The ALJ noted that Plaintiff could drive, prepare food, use a microwave, shop, play cards, and perform light household chores, and that Plaintiff was observed to be clear, have good hygiene, wear appropriate clothing, to be alert, to have clear speech, and to think clearly and logically with rumination. [*Id.*].

The ALJ also stated that there was evidence that Plaintiff stopped working for reasons unrelated to his impairment and that Plaintiff stated he felt as though he had been "black balled" by local employers. [*Id.*]. The ALJ further noted that, although Plaintiff had claimed that his stress prevent him from completing tasks, the medical records did not indicate that he had undergone any treatment for stress and he admitted to Dr. Maierhofer that he would feel much better if he had a job. [R19-20].

The ALJ found that Plaintiff was capable of performing his past work as a warehouse worker and hand packager. [R20]. Alternatively, the ALJ found that, based on the VE's testimony, Plaintiff could work as a bailor, night cleaner, and jack hammer operator. [R20-21]. Accordingly, the ALJ found that, based on the testimony of the VE, a person with Plaintiff's age, education, work experience, and RFC, was capable of making a successful adjustment to work that existed in

36

significant numbers in the national economy.  [R21].  The ALJ therefore found that Plaintiff had not been under a disability from December 31, 2007 through the date of the decision.  [*Id.*].

## VII.  <u>ARGUMENTS OF THE PARTIES</u>

Plaintiff argues that, in his first remand, the Appeals Council directed the ALJ to evaluate source opinions, particularly pointing to Dr. Kadam, a treating physician, Dr. Maierhofer, an examining psychologist, and Dr. Nkongho, a record reviewer.  [Doc. 12 at 11].  Plaintiff argues that, in the second remand, the ALJ was directed to consider the evaluation of Kirby, a Certified Rehabilitation Counselor.  [*Id.*].  Plaintiff argues that the ALJ failed to do either of the above. [*Id.*].

With regard to Dr. Kadam, Plaintiff argues that Dr. Kadam concluded that he would not be able to tolerate a competitive work setting and, although he was a treating physician, the ALJ did not evaluate, weigh, or acknowledge his findings, but was required to do so.  [*Id.* at 12-13].  Plaintiff further contends that the ALJ failed to evaluate his cervical impairment, which was diagnosed by his treating physician and captured in cervical spine x-rays in June 2012, a CT scan in September 2013, and an MRI in 2015.  [*Id.* at 13].  Plaintiff notes that the ALJ stated that the clinical findings were "relatively unremarkable," but argues that

37

the ALJ failed to discuss other objective findings consistent with his complaints of pain radiating out from his neck.  [*Id.* at 13-14].  Plaintiff submits that the ALJ did not even find his stenosis to be medically determinable impairment and that the ALJ's error was not harmless in that it could have impacted the jobs the VE identified for him and limited his ability to do medium and heavy exertional work. [*Id.* at 14-15].

Next, Plaintiff argues that the ALJ erred in evaluating Dr. Pineda's opinion, which imposed limitations precluding him from competitive work.  [*Id.* at 16]. Plaintiff notes that, although the ALJ gave the opinion lesser weight because no findings would have required urgent care or hospitalization, neither was required for the findings Dr. Pineda made.  [*Id.*].  Plaintiff argues that the ALJ cited normal findings but ignored abnormal ones and did not acknowledge the consistency of Dr. Pineda's findings with other sources.  [*Id.* at 17].

Plaintiff next argues that the ALJ also erred in failing to evaluate the opinion of Kirby, the Rehabilitation Counselor, despite the fact that the Social Security regulations require consideration of all evidence.  [*Id.* at 18].  Plaintiff argues that Kirby concluded that he would not be able to benefit from vocational rehabilitation services but the ALJ did not mention her findings or evaluate whether it was consistent with other evidence.  [*Id.* at 18-19].

Plaintiff also contends that the ALJ also erred in evaluating Dr. Maierhofer's opinion that Plaintiff had poor cognitive abilities, that he was not malingering, and that his future opportunities for employment were limited by his depression and fluctuating moods. [*Id.* at 19-20]. Plaintiff notes that the ALJ gave Dr. Maierhofer's opinion partial weight because she did not agree that Plaintiff would be limited by his depression and fluctuating moods but argues that the contrary evidence Plaintiff points to, daily activities including driving and using a microwave, is insufficient. [*Id.* at 20-21]. Plaintiff contends that although he told Dr. Maierhofer he would probably feel better if he had a job, he also indicated he did not know if he would be able to work in the future. [*Id.* at 21]. Plaintiff also observes that the ALJ stated she agreed with the other limitations imposed by Dr. Maierhofer but did not include a limitation related to interacting with supervisors. [*Id.* at 21-22].

Next, Plaintiff argues that the ALJ erred in evaluating the record reviewer's opinion because, although the ALJ gave it great weight, she only noted that the reviewer did not find any marked limitations, that his concentration and persistence were adequate, and that any interruption in schedule would be temporary, but did not include any limitation related to his interacting with supervisors. [*Id.* at 22-23]. Plaintiff argues that the ALJ also did not account for

39

other limitations, including prohibiting his working with the public and the need

for him to work in a low-stress environment.  [*Id.* at 23].  Plaintiff notes that the

record reviewer limited him to working with a "non-confrontational supervisor,"

which he argues is not compatible with competitive work.  [*Id.* at 24-25].

Next, Plaintiff argues that the ALJ erred in evaluating Dr. Doster's opinion

because, although the ALJ relied on his daily activities to give great weight to

Dr. Doster's opinion that he did not have any disabling conditions, the ALJ did

not include any limitations Dr. Doster imposed.  [*Id.* at 25-26].  Plaintiff identifies

limitations imposed by Dr. Doster and others including restrictions on his ability

to engage in significant social interactions, difficulty with supervisors, and

difficulty coping with job stress.  [*Id.* at 26].  Plaintiff argues that the ALJ's

failure to explain her omission of a limitation related to interacting with

supervisors was reversible error.  [*Id.* at 26-27].  Plaintiff submits that an ALJ

cannot reject a portion of a medical opinion without providing a reasoned

explanation for doing so.  [*Id.* at 27-28].

In his second contention, Plaintiff argues that the ALJ's conclusion that his

statements about the severity of his condition were not entirely consistent with the

evidence was not supported by substantial evidence.  [*Id.* at 28-29].  Plaintiff

admits he was late to his evidentiary hearing but argues this is consistent with his

forgetfulness and impaired concentration.  [*Id.*].  He further argues that that ALJ's conclusion that he had not received treatment indicating he was totally disabled, is not a requirement for a disabled finding.  [*Id.* at 29].  Moreover, although the ALJ was required to evaluate the entire record, she did not discuss his pain, [*id.* at 29-30]; and the ALJ noted he had never undergone treatment to cope with stress but contends the ALJ overlooked relevant evidence in the record.  [*Id.* at 30-31].   Plaintiff requests that the case be remanded for the award of benefits. [*Id.* at 31].

In response, the Commissioner argues that the ALJ's finding that Plaintiff is not disabled followed the proper legal standards and was supported by substantial evidence.  [Doc. 13 at 2].  First, the Commissioner argues that Plaintiff cannot show harm from the failure of ALJ to expressly consider Dr. Kadam's opinion.   [*Id.* at 8].   The Commissioner admits that the ALJ did not cite Dr. Kadam's opinion but did refer to his treatment notes and, in any event, he argues that any error was harmless because the opinion was conclusory and directly contradicted by other evidence in the record.  [*Id.* at 8-9].  Specifically, the Commissioner argues that although Dr. Kadam states that Plaintiff was primarily bedridden from 1984, Plaintiff reported working as a stacker from 1981 to 1992, as a septic tank drainer from 1995 to 1996, and as a steel handler from

1998 to 2006. [*Id.* at 9]. The Commissioner argues that Dr. Kadam's own treatment records contradict his opinion and show generally unremarkable musculoskeletal and neurological examinations. [*Id.* at 10-11].

Next, the Commissioner argues that the ALJ considered all of Plaintiff's impairments and was not required to discuss every piece of evidence in reaching her conclusion. [*Id.* at 11-12]. The Commissioner notes that the ALJ found that Plaintiff's musculoskeletal and neurological examinations were unremarkable, a finding that was supported by Dr. Comerford's examination, and so substantial evidence supported the ALJ's findings that Plaintiff did not have greater limitations than those found in the RFC. [*Id.* at 12]. The Commissioner argues that Plaintiff's assertion that the ALJ failed to discuss various diagnostic findings is misguided because the ALJ did not need to discuss every piece of evidence and diagnoses do not establish any particular functional limitations. [*Id.* at 12-13]. The Commissioner also argues that Plaintiff has failed to identify any specific limitations that should have been included in the RFC to account for his cervical impairment and that the Plaintiff needed to show the he could not perform jobs identified by the VE, such as routing clerk, to show harm. [*Id.* at 13-14].

The Commissioner argues that the ALJ properly discounted Dr. Pineda's opinion because his opinion was unsupported by his own treatment notes, which

42

showed that Plaintiff related well, had normal speech, was cooperative, and had no emotional disturbances.  [*Id.* at 15].  The Commissioner further contends that Dr. Pineda's notes generally show that Plaintiff had a coherent thought process without judgment problems, which is inconsistent with his conclusion that Plaintiff had poor or no ability to follow work rules.  [*Id.* at 15-16].

Next, the Commissioner contends that Plaintiff can show no reversible harm from the ALJ's lack of consideration of a statement from Ms. Kirby because the error was harmless.  [*Id.* at 16].  The Commissioner argues that the ultimate decision as to disability is left to the Commissioner and, also, that Ms. Kirby's statement was conclusory and unsupported by clinical findings.  [*Id.* at 16-17].

Next, the Commissioner argues that the ALJ properly discounted Dr. Maierhofer's opinion because it was not fully consistent with the other evidence, particularly the fact that Plaintiff had numerous generally unremarkable status examinations and could perform daily chores.  [*Id.* at 17-18].  The Commissioner's argues that Plaintiff's assertion that the ALJ was required to specifically refer to supervisors in her RFC findings is meritless under the Eleventh Circuit's decision in *Brothers v. Comm'r of Soc. Sec*, 648 Fed. Appx. 938, 939 (11th Cir. Apr. 26, 2016). [Doc. 12 at 18-19].

The Commissioner next contends that the ALJ's RFC accounts for

Dr. Nkongho's opinion because it included a social interaction restriction, the ALJ was not required to refer to supervisors, and Plaintiff was limited to simple, routine tasks involving no more than simple instructions, simple worked-related decision, and few workplace changes. [*Id.* at 19]. The Commissioner also argues that the ALJ's properly gave Dr. Doster's opinion great weight because it was supported by the medical evidence, which showed that numerous mental status examinations were generally unremarkable, and the opinion was consistent with Plaintiff's reported activities. [*Id.* at 19-20].

The Commissioner then argues that substantial evidence supports the ALJ's subjective complaint analysis and Plaintiff has not carried his burden of proving the contrary. [*Id.* at 20-21]. The Commissioner argues that the ALJ reasonably found that Plaintiff's allegations were inconsistent with relatively unremarkable clinical findings, numerous mental status examinations, and a conservative treatment history. [*Id.* at 21-22]. The Commissioner argues that the Plaintiff disagrees with the ALJ's factual findings but that does not detract from the substantial evidence supporting the ALJ's reasons for discounting his subjective complaints and that subjective complaint analysis is the province of the ALJ. [*Id.* at 22-23].

Finally, the Commissioner argues that Plaintiff has not proven disability

beyond a doubt and that, if remand is necessary, it should be for additional fact-finding.  [*Id.* at 23].  The Commissioner argues that remanding for payment is only appropriate when the evidence clearly establishes disability without a doubt, which is not the case here.  [*Id.* at 23-24].

In reply, Plaintiff argues that the ALJ's failure to address Dr. Kadam's opinion was not harmless because an ALJ must address every opinion received and, moreover, Dr. Kadam's opinion provided specific physical limitations and did not merely find him to be disabled.  [Doc. 16 at 1-2].  Plaintiff argues that the fact that the ALJ cited Dr. Kadam's treatment notes is insufficient because the ALJ did not say anything regarding Dr. Kadams' treatment of his neck, hand, and knee pain or the cervical spine x-rays taken in June 2012 that revealed degenerative changes.  [*Id.* at 2].  Plaintiff contends that the Commissioner's argument is an improper *post hoc* rationalization.  [*Id.* at 3].

Plaintiff next argues that the ALJ failed to evaluate his cervical impairment, indicated by both a CT scan in September 2013 and x-rays ordered by Dr. Kadam in 2012, and the ALJ's statement that she considered the entire record was insufficient to remedy this omission.  [*Id.* at 3-4].  Plaintiff argues that, contrary to the Commissioner's assertion, he was not required to identify specific limitations that the ALJ should have included.  [*Id.* at 4].  Plaintiff further argues

that the pain would logically limit his ability to move his neck, lift, reach, and grasp, and the VE's testimony did not include any limitations in these areas. [*Id.* at 5].

Next, Plaintiff argues that the ALJ erred in evaluating Dr. Pineda's opinion because although there were normal findings, there were also abnormal ones that were consistent with Dr. Pineda's conclusions.  [*Id.* at 5-6].  Plaintiff again argues that the ALJ failed to consider the consistency of Dr. Pineda's findings with those of other sources, which was required, and the  Commissioner's citations to other psychiatric notations in the record do not show that the ALJ had good cause to reject this treating psychiatrist's opinion.  [*Id.* at 6].  Plaintiff argues that the ALJ failed to evaluate Ms. Kirby's opinion, despite being directed to by the Appeals Council, and that the Commissioner's improperly offers *post hoc* rationales for why this was harmless.  [*Id.* at 6-7].  Plaintiff claims that the Commissioner's assertion that the limitations imposed by Kirby are inconsistent with other evidence is erroneous.  [*Id.* at 7].

Plaintiff then argues that the ALJ erred in evaluating Dr. Maierhofer's opinion and that the Commissioner did not address this contention of error. [*Id.* at 7-8].  Plaintiff argues that, although the ALJ stated she agreed with most of the limitations asserted by Dr. Maierhofer, the ALJ did not impose any limitations

46

on Plaintiff's ability to interact with others, although that limitation was supported by Dr. Maierhofer and others' findings. [*Id.* at 8]. Plaintiff disagrees with the Commissioner's interpretation of *Brothers* and argues that it was non-binding, while binding caselaw requires ALJ's to specifically state the weight accorded to each item of evidence. [*Id.* at 8-9].

Plaintiff argues that the ALJ erred in evaluating the record reviewer's opinion because, although she gave great weight to it, it imposed numerous work-related limitations, and the ALJ did not include any such limitations in the RFC. [*Id.* at 9]. Plaintiff contends that the reviewer's restrictions would create an environment "resembling a shelter workshop" and that a limitation to simple, routine instructions, tasks, and decisions is insufficient. [*Id.* at 10]. Plaintiff further contends that the ALJ erred in evaluating Dr. Doster's opinion because, although she gave the opinion great weight, she did not include all the limitations imposed by Dr. Doster and others, such as Plaintiff having significant social limitations. [*Id.*]. Thus, Plaintiff argues, the ALJ erred by rejecting portions of a medical opinion without a reasoned explanation for doing so. [*Id.* at 11].

Next, Plaintiff contends that the ALJ's assessment of his symptoms was not supported by substantial evidence and that the Commissioner points to normal findings in the record without acknowledging his sadness and other negative

symptoms. [*Id.*]. Plaintiff argues that the Commissioner repeated the ALJ's claims without addressing his argument that her assumptions and analysis were flawed. [*Id.* at 11-12]. Plaintiff also contends that the Commissioner did not address the ALJ's failure to consider that his neck pain was consistent with severe forminal stenosis. [*Id.* at 12]. Plaintiff argues that the Commissioner's assertion that he received conservative treatment is incorrect, as he was prescribed a narcotic-like medication Tramadol. [*Id.*].

In conclusion, Plaintiff requests that the case be remanded for an award of benefits because he has already had three hearings from two different ALJs over ten years. [*Id.* at 12-13]. Plaintiff argues that no additional factfinding is necessary. [*Id.* at 13].

## VIII. <u>DISCUSSION</u>

After careful consideration of the parties' arguments, the ALJ's decision, and the evidence of record, the undersigned concludes that the ALJ's decision was based upon errors of law and not supported by substantial evidence.

First, the ALJ's opinion did not discuss Dr. Kadam's opinion and only referred to his findings for the limited purpose of analyzing his treatment for Bell's Palsy. [*See* R10-22]. The Commissioner is required to evaluate every medical opinion the agency receives. 20 C.F.R. § 404.1527(c); *cf.*

48

20 C.F.R. § 404.1527(b)[10] ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case").

Moreover, the record indicates that Dr. Kadam saw Plaintiff repeatedly over several years and so qualified as a treating physician. [*See*, *e.g.*, R879-82 (November 2011), R918-19, R1040, R1153-55 (June 2015), R1167, R1172-74]; *Nyberg v. Comm'r of Soc. Sec.*, 179 Fed. Appx. 589, 591 (11th Cir. May 2, 2006) (stating that a treating physician is one who provides a claimant with medical treatment or evaluation and also has an ongoing treatment relationship with the claimant). Under Social Security regulations in effect that govern this case, substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Indeed, the ALJ's failure to specify the weight given a treating

---

[10]    While these Social Security Regulations have subsequently changed, the changes apply only to claims filed after March 27, 2017. *Robert W. v. Comm'r, Soc. Sec.*, No. 1:18-cv-0998, 2019 WL 3934803, at *8 (N.D. Ga. Aug. 20, 2019); 20 C.F.R. § 404.1520c. Plaintiff's claim in the current matter was filed in 2010. [R452-61].

physician's opinion or the reason for not giving it any weight is reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986).  An ALJ's failure to address a treating physician's opinion is particularly problematic when the physician treated the claimant for an extended period.   *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985).

The Court further notes that the physical capacity form signed by Dr. Kadam asserts that Plaintiff would not be able to tolerate a competitive work setting.   [R889].   Further, it includes exertional requirements, including that Plaintiff could only stand or sit for 15 minutes, and required 1-2 hours rest for each 5-6 hours worked, could occasionally lift and carry up to 26 to 50 pounds, could occasionally bend, square, climb, and reach overhead, but could do little or no crawling or pulling, [*id.*], while the RFC includes no exertional limitations, [R16].   Dr. Kadam further indicated that Plaintiff needed to totally avoid unprotected heights, being around moving machinery, and driving, [R889], while the RFC includes no such limitations, [R16].

Therefore, not only did the ALJ not consider the opinion, which she was required to do, 20 C.F.R. § 404.1527(c), *MacGregor*, 786 F.2d at 1053, but she also did not give the opinion controlling weight, *see Lewis*, 125 F.3d at 1440, which is particularly relevant because the opinion appears to run contrary to the

findings outlined in the RFC, [*compare* R16 *with* R889].[11]

For its part, the Commissioner admits that the ALJ did not address Dr. Kadam's opinion, but argues that the error was harmless because the opinion was conclusory and directly contradicted by other evidence in the record. [Doc. 13 at 8-9].   The Eleventh Circuit applies harmless error analysis in Social Security cases. *See*, *e.g.*, *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding ALJ's error to be harmless when ALJ incorrectly stated that plaintiff was closely approaching advanced age, but then applied the Grid that reflected the plaintiff's correct age); *Murray v. Heckler*, 737 F.2d 934, 936 (11th Cir. 1984) (finding ALJ's mechanistic application of age Grids to be harmless error).   The failure to address a medical opinion may be harmless where it is "not supported by . . . medical findings." *See Chapman v. Comm'r of Soc. Sec.*, 709 Fed. Appx. 992, 995 (11th Cir. Sept. 26, 2017).   It also may be harmless

---

[11]   Plaintiff additionally argues that the ALJ's decision as in conflict with prior decisions of the Appeals Council, which had ordered the ALJ to consider Dr. Kadam's remand during a previous decision.   [Doc. 12 at 11; *see also* R206].   However, in cases such as this one, where the Appeals Council declines to review the ALJ's decision, the ALJ's opinion becomes the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, 422.210(a).   Therefore, neither the Appeals Council's previous orders remanding the case back to the ALJ or its order in this case declining to review it are properly before the Court.

where the treating doctor's records are contradicted by other doctor's opinions. *See Tillman v. Comm'r, Soc. Sec. Admin.*, 559 Fed. Appx. 975, 975-76 (11th Cir. Apr. 4, 2014).

First, the Commissioner argues that the physical capacity form is contradicted by other evidence in that it asserts that Plaintiff has been severely disabled since 1982, [R889; Doc. 13 at 9], while other evidence in the record indicated that Plaintiff had worked until 2006 sometimes doing apparently physically demanding labor, such as handling steel, [R550-51]. This argument is unconvincing, however. While Dr. Kadam's opinion does indicate that Plaintiff's disability began in 1982, the opinion itself was signed by Dr. Kadam on April 16, 2012. [R889]. The Court finds that the opinion is relevant as to Plaintiff's disability on that date, and although the ALJ is free to choose among conflicting evidence supported by the record, the fact that Dr. Kadam also noted that Plaintiff's disability began in 1982 does not necessarily mean that Dr. Kadam believed that his findings began in 1982 and did not vary over the subsequent thirty years.[12] More importantly, the Court notes that the contradiction pointed to by the Commissioner relates to the beginning of Plaintiff's alleged disability, and

---

[12]     The Court notes that, in a previous hearing, Plaintiff testified that he was thrown from a car in 1982, which resulted in a back injury.  [R155].

not to the limitations created by that disability, and whether they comport with the RFC.

Next, the Commissioner argues that the ALJ's failure to evaluate Dr. Kadam's opinion was harmless because the opinion did not refer to his treatment notes and was conclusory. [Doc. 13 at 8-9]. While the Commissioner is correct that the opinion does not explicitly cite treatment notes, the Court finds that this deficiency is ameliorated by the fact that Plaintiff and Dr. Kadam had a long treatment history from which Dr. Kadam could draw his conclusions. Prior to the date of the opinion, Dr. Kadam saw Plaintiff at least twice, [*see, e.g.*, R879-82, 1176-77], and subsequently he saw him numerous times, [*see, e.g.*, R918-19; R926-28; R1167, 1163-65]. There is no indication that Dr. Kadam changed or revised his opinion in these subsequent visits.

The Court also finds that the opinion was not sufficiently conclusory for the ALJ's failure to discuss it to be harmless. Conclusory opinions often include bald assertions that a plaintiff is disabled. For example, in *Chapman*, the court found that an ALJ's failure to address a letter was harmless when it only listed some of the claimant's impairments, stated he was "permanently disabled," and was otherwise contradicted by medical findings. *Chapman*, 709 Fed. Appx. at 995. However, in the present case, in addition to a finding of

disability, Dr. Kadam included an identification of Plaintiff's pain level, an evaluation of what activities he could completed in an eight-hour work day, a description of how often he would be able to lift and carry weights between 5 and 50 pounds, an evaluation of how often he would be able to bend, squat, crawl, climb, pull, and reach overhead, how often he could use his fingers and hands for repetitive actions, and also various environmental restrictions, including whether he could be around unprotected heights and moving machinery.   [R889]. Accordingly, the Court finds that the opinion included significantly more information than a mere assertion of disability.

Finally, the Commissioner argues that the ALJ's failure to address Dr. Kadam's opinion was harmless because it was not consistent with the medical evidence.   [Doc. 13 at 10-11].   However, the Court finds this argument unconvincing, specifically as it concerns Plaintiff's alleged severe cervical stenosis.   Although the ALJ did not find this to be a medically determinable impairment, evidence in the record is supportive of that Plaintiff had such an impairment.   Plaintiff saw Dr. Kadam on May 14, 2012 and an examination of Plaintiff's lower back pain revealed a degree of left neural foraminal stenosis at C5-C6, C6-C-7.   [R924].   Dr. Kadam concluded that there were degenerative changes of the cervical spine.   [*Id.*].   Similarly, on September 7, 2013, Plaintiff

54

received a CT Cervical spine non contrast exam.  [R963].  The impression was of moderate degenerative changes to the mid-cervical spine and osteophytes.  [*Id.*]. On March 5, 2015, Plaintiff saw Dr. Comerford at Emory Healthcare for an MRI Cervical Spine without Contrast.  [R1065].  He noted that C5-C6 had mild right and severe left neural foraminal narrowing and borderline central spinal stenosis. [*Id.*].   He made the same findings with regard to C6-C7.   [R1066].   His impressions were of mild to moderate degenerative change between C5-C7, severe left neural foraminal narrowing at C5-C6, and mild to moderate bilateral neural foraminal narrowing from C6-C7.  [*Id.*].  Dr. Kadam's findings were therefore supported by other evidence in the record.

In addition, Plaintiff repeatedly complained of neck and back pain, including repeatedly to Dr. Kadam, or treatment notes indicated a history of the same.  [*See*, *e.g.*, R896, 963, 1014, 1040, 1056, 1064, 1159, 1163, 1204].   To treat his pain, Plaintiff was prescribed a number of drugs, including Tramadol, which is a narcotic-type drug.  [*See*, *e.g.*, R932, 1059; *see also* n.8, *supra*.  This evidence supports Dr. Kadam's finding Plaintiff to be in serious pain and to limitations in his ability to bench and reach overhead.  [R889].

On this record, the Court finds that the ALJ failed to consider the opinion of Dr. Kadam, a treating physician, and that failure was error.  In addition, the

Court finds that the error was not harmless particularly with regard to Dr. Kadam's diagnosis of severe cervical stenosis, as that diagnosis was supported by other evidence in the record and also Plaintiff's repeated complaints of significant pain to Dr. Kadam and others. Consideration of this evidence may well have led to additional limitations within the RFC, which included no exertional limitations. For example, the VE's finding that Plaintiff could work as a jackhammer operator may no longer be appropriate. [R68-69].

For these reasons, the Court concludes that the ALJ's decision included errors of law and was not supported by substantial evidence. Accordingly, this matter is **REVERSED AND REMANDED** to the Commissioner for further consideration of Plaintiff's claims.

Because the undersigned finds that the ALJ erred to reversal with respect to Plaintiff's first assignment of error, the Court has no reason to address his other assignment of error at any great length. *See Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) ("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other claims"). However, because the issue has already been touched upon above, the Court notes that the ALJ's failure to consider Ms. Kirby's opinion was harmless error. [*See* R623; *Cf.* Doc. 12 at 18-19]. As was the case in *Chapman*, Ms. Kirby's opinion took

the form of a letter that opined only as to Plaintiff's disability and whether he would benefit from rehabilitation services. [R623]. Disability determinations are left to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Unlike the opinion of Dr. Kadam, there is no evidence that Kirby had an extensive treatment relationship with Plaintiff and her opinion contains no analysis of Plaintiff's limitations. [*Compare* R623 *with* R889]. The ALJ's failure to discuss her opinion was therefore harmless error. *See Tillman*, 559 Fed. Appx. at 975-76.

As a final matter, the Court declines Plaintiff's request to remand the case for the payment of benefits as opposed to additional factfinding. [Doc. 12 at 31; Doc. 16 at 12-13]. Given the procedural history of this matter, the Court is not unsympathetic to Plaintiff's request. Courts generally reverse and remand for further proceedings when the ALJ has failed to apply the correct legal standards. *Bright-Jacobs v. Barnhart*, 386 F. Supp. 2d 1295, 1349 (N.D. Ga. 2004). However, a court may also reverse and remand with instructions for the Commissioner to award benefits if "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). This means that if factual issues remain, a court cannot usurp the Commissioner's role in making a disability determination by awarding benefits.

*See Boyd*, 704 F.2d at 1211.  As described above, the Court has found that the ALJ in this case committed errors of law and that her decision was not supported by substantial evidence.  This does not mean, however, that disability has been proven "without any doubt."  *Davis*, 985 F.2d at 534.  Even assuming Plaintiff's cervical stenosis is a medically determinable impairment, it is not clear to the Court that the condition would render Plaintiff unable to "engage in any other kind of substantial gainful work that exists in the national economy."  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).  The Court therefore declines to usurp the Commissioner's role by finding that such was the case.  *Boyd*, 704 F.2d at 1211.

## IX.   <u>CONCLUSION</u>

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 22nd day of September, 2020.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

58